UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **RUFUS TREVILLION, SR. AND** : | | **CIVIL ACTION NO. 18-610** |
| **LOLETTE TREVILLION** | | |
| **VERSUS** : | | |
| **UNION PACIFIC RAILROAD** : | | **MAGISTRATE JUDGE KAY** |
| | | **(By Consent)** |

## MEMORANDUM RULING

Before the court is Union Pacific Railroad's Motion for Summary Judgment, which seeks dismissal of all remaining claims asserted by the plaintiff Doc. 31. The motion is opposed by plaintiffs, Rufus Trevillion, Sr. and his spouse Lolette Trevillion. This matter is before the undersigned by the consent of the parties. Doc. 26.

For the following reasons, the Motion for Summary Judgment is **GRANTED**, and the action **DISMISSED WITH PREJUDICE** by accompanying judgment, each party to bear its own costs.

### I.
#### BACKGROUND

Rufus Trevillion, Sr. (hereafter "Trevillion") is a former employee of Union Pacific. Doc. 1, p. 3, ¶¶ 8-9. On August 13, 2014, Trevillion was performing his job as Union Pacific's "Lead Bridge Tender" when a heated exchange took place between him and another Union Pacific employee. Doc. 1, pp. 4-5, ¶¶ 15-25. Trevillion alleges that, after advising this employee about the need to conduct maintenance on one of the bridges maintained by Union Pacific, the employee became "belligerent," and assaulted him. *Id.* In deposition, Trevillion described the other employee grabbing his right arm or right side and brushing up against him and blocking his way

up the steps to the bridge shack in an effort to provoke him. Doc. 34-1, p. 65; 76-80. Trevillion was sufficiently upset that he called his wife, Lolette Trevillion, who felt it was necessary to come out to meet him. Doc. 34-1, p. 85. When supervisor Keith Townley later arrived at the scene, Lolette expressed concern about Trevillion's blood pressure being elevated. Doc. 32, p. 2, ¶ 4.

Following the incident, Trevillion was sent home by his supervisor and referred for medical evaluation. Doc. 1, p. 5, ¶ 20-22. He visited his primary care provider, Dr. Renois, the next day on August 14, 2014. Doc. 34, att. 1, pp. 166-167. Dr. Renois noted that Trevillion had an anxiety-related condition, and this was the first time Trevillion could remember being diagnosed with an anxiety problem. *Id.* at p. 168. On August 28, 2014, Trevillion began seeing Dr. James Quillin, a psychiatrist who noted that Trevillion was having stress-related dreams related to the August 13 incident. *Id.* at 193-95. At that visit, Dr. Quillin prescribed Zoloft and Temazepam, the generic name for Restoril. *Id.* at 195-96. Dr. Quillin later added a prescription for Lorazepam. *Id.* at 197-98. Trevillion began taking these medications after Dr. Quillin prescribed them, and he continued taking at least one of them or some other form of sleeping medication through the date of his deposition on November 11, 2020. *Id.* at 198. Some weeks after he first began taking these new medications, Union Pacific learned that Trevillion was taking Restoril, which bridge tenders are prohibited from taking. Doc. 31, att. 5, p. 3, ¶ 11.

Trevillion admits that the bridge tender job is a safety-sensitive position, and that not being fit for duty as a bridge tender could create a substantial risk of injury to himself and others. Doc. 34, att. 1, p. 37. Bridge tenders work alone and are responsible for managing the safe passage of trains across the bridge and vessels under it. Doc. 31, att. 5, p. 2, ¶ 5. Bridge tenders also inspect and operate bridges. *Id.* The risk of a sudden incapacitation or reduced functioning could pose

catastrophic risks for substantial harm to the employees as well as third parties. *Id; see also* Doc. 31, att. 3, p. 1, ¶ 2; Doc. 34, att. 1, p. 200-01.

Because bridge tenders have safety-sensitive jobs, federal law prohibits bridge tenders from taking certain prescription medications that could inhibit job performance, even off duty. Doc. 31, att. 5, p. 1, ¶ 3. Two of the prohibited drugs are Restoril, the brand name for Temazepam, and Ativan, the brand name for Lorazepam. *Id.* Both Lorazepam and Temazepam are listed as controlled substances in 21 C.F.R. § 1308.14, Schedule IV, and therefore, railroad employees are generally prohibited from using them "at any time, whether on duty or off duty." 49 C.F.R. § 219.5, § 219.102. These drugs are prohibited because of their long-acting sedating side effects, which can extend to the day after they are taken at bedtime. Doc. 31, att. 5, p. 1, ¶ 3.

Trevillion took a medical leave of absence following the incident of August 13, 2014, though perhaps not entirely voluntarily. Plaintiff's complaint alleges that he was "pulled out of service" at this time, (Doc. 1, p. 5, ¶ 20.), but the Complaint also acknowledges that he received notice of a medical review "based on Supervisor-Requested Evaluation" and he was told that he had been referred to the Health Services Department ("HSD") for a fitness-for-duty ("FFD") evaluation based on his supervisor's safety concerns. Doc. 1, p. 6, ¶ 28. Trevillion also testified that he voluntarily stayed home from work and consulted his own doctor on August 14 because was still "agitated and nervous and anxious" and not sleeping well. Doc. 34, att. 1, p. 95. He indicates Union Pacific granted him an initial "Medical Leave of Absence" from August 15, 2014, to October 15, 2014, that was eventually extended through January 31, 2015. Doc. 1, p. 8, ¶¶ 40-42.

Bridge tenders are subject to Fit for Duty ("FFD") testing when there is legitimate concern about the employee's ability to safely perform essential job functions. Doc. 31, att. 5, p. 1, ¶ 4.

Shortly after the Incident, Union Pacific began an evaluation of Trevillion's fitness for duty. Doc. 31, att. 5, p. 2, ¶ 5. Trevillion's supervisor, Keith Townley, had spoken with Trevillion in the aftermath of the incident, and he observed that Trevillion appeared emotionally distraught, disoriented, and had an unsteady gait. Doc. 32, p. 2, 8. Townley was concerned that Trevillion had developed a medical condition that might interfere with his ability to return to his job as bridge tender safely. Doc. 32, p. 2, ¶¶ 6-7. He referred Trevillion to Union Pacific's Health Services Department ("HSD") for evaluation. *Id.* Dr. Matthew Hughes, then Union Pacific's Associate Medical Director, and Nurse Rhonda Ross led the inquiry into Trevillion's medical fitness for duty. Doc. 31, att. 5, p. 2, ¶ 5. This inquiry began on August 15, 2014, and necessitated Trevillion being off work while it was being conducted, based on Dr. Hughes' review of his medical history. Doc. 31, att. 5, p. 2, ¶ 7. Trevillion agreed to provide his medical records to Union Pacific and to cooperate in the FFD testing. Doc. 31, att. 5, p. 23, ¶ 8. After reviewing Trevillion's prior medical history from his employment file, Dr. Hughes suspected that Trevillion may have had a transient ischemic attack (TIA), which put him at higher risk for a stroke, which in turn posed a potential risk in his safety-sensitive position. *Id.* Dr. Hughes therefore concluded that he was properly off work until his neurological and neuropsychological fitness could be evaluated. Doc. 31, att. 5, p. 2-3, ¶¶ 7-10. Dr. Hughes and Nurse Ross requested a neurological evaluation from Dr. Fayez Shamieh. Doc. 31, att. 5, p. 3, ¶ 10.

On or about October 5, 2014, Dr. Shamieh's report informed Hughes and Ross that Trevillion had begun taking Restoril and Lorazepam after consulting Dr. Quillin on August 28, 2014. Doc. 31, att. 5, p. 3, ¶ 11. When Dr. Hughes and nurse Ross learned this, they informed Trevillion of the safety regulations that prohibited him from working as a bridge tender while taking those medications, and they attempted to work with him to find an alternative, encouraging

him to discuss an alternative medication with his doctor. Doc. 31, att. 5, p. 3, ¶ 11. They sent plaintiff a letter explaining this in greater detail. Doc. 31, att. 5, p. 3, ¶ 11; *id.*, p. 20-22; Doc. 34, att. 1, pp. 183-184. Trevillion testified that he was very adamant that he would not stop taking Restoril when Dr. Hughes and Nurse Ross discussed this possibility with him. Doc. 34, att. 1, pp. 191-92. He did not recall if he ever had a conversation with Dr. Quillin regarding an alternative medication. Doc. 34, att. 1, pp. 185.

Dr. Hughes and Nurse Ross determined that neuropsychological evaluation was necessary as the next step in the FFD evaluation. Doc. 34, att. 1, p. 111; Doc. 31, att. 5, pp. 2-3, ¶¶ 7,12. Because Union Pacific knew that Trevillion was seeing psychiatrist Dr. Quillin, they requested that he be evaluated by psychiatrist Dr. Friedberg. Doc. 34, att. 1, p. 186. Although he appeared at Dr. Friedberg's office, Trevillion refused to complete the testing because he perceived the practice as unprofessional due to its location in a residential neighborhood and the presence of a dog at the doctor's office. Doc. 34, att. 1, p. 187-88. He also had concerns about the doctor having a personal conflict of interest because he had previously heard her name mentioned by the coworker with whom he had had the altercation on August 13. Doc. 34, att. 1, p. 188. Union Pacific agreed to allow Dr. Quillin to perform the neuropsychological evaluation. Doc. 34, att. 1, p. 190-91. Union Pacific's records indicate that Dr. Hughes and Nurse Ross prepared a letter for Trevillion to take to his psychiatrist so that Dr. Quillin could complete the neuropsychological evaluation, and that Trevillion agreed to do so. Doc. 34, att. 1, p. 191; Doc. 31, att. 5, p. 3-4, ¶¶ 14-15. Mr. Trevillion does not remember being given the letter, but he does recall being advised that he would not be able to return to work if he continued taking Restoril and being adamant that he would not stop taking Restoril. Doc. 34, att. 1, p. 191-92. Union Pacific never heard from Dr. Quillin, and the FFD evaluation was accordingly never completed. Doc. 31, att. 5, p. 4.

Trevillion has neither worked nor applied for another job since August 13, 2014. Doc. 34, att. 1, p. 28. He testified that the reason he has not looked for any work since August 2014 is because he is still under the care of doctors and taking medications. Doc. 34, att. 1, p. 35. He eventually applied for and received railroad disability pay retroactive to August 28, 2014. Doc. 34, att. 1, p. 223.

On February 6, 2015, Trevillion filed a complaint of racial discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC.") Doc. 1, p. 9. On September 26, 2015, he amended his EEOC complaint to include violations of the Americans with Disabilities Act ("ADA.") *Id.* On February 8, 2018, the EEOC issued him a right to sue letter. *Id.*

Trevillion's Complaint originally set forth eight counts, five of which were dismissed following defendant's Rule 12(b)(6) partial motion to dismiss, on the basis that Plaintiff's state-law claims are prescribed (time-barred) under Louisiana law. Docs. 14, 15. The remaining allegations of the Complaint allege that Trevillion developed medical issues as a result of the incident of August 13, 2014, and further that the handling of the incident by Union Pacific constituted racial discrimination, retaliation, and hostile work environment.

Count I alleges that defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* by treating Trevillion differently than white employees in the same position and terminating him without a legitimate, non-discriminatory reason. Doc. 1, p. 10, ¶¶ 50-52. Count II alleges that defendant violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, by failing to accommodate his alleged disability and discriminating against him because of said disability. Doc. 1, p. 11-12, ¶¶ 54-62. Count III alleges that defendant's actions were retaliatory. Doc. 1, p. 12-13, ¶¶ 63-67. Count VII alleges that Plaintiff was subjected to a hostile work environment. Doc. 1, p. 16, ¶¶ 79-83.

Defendant now moves for summary judgment as to the remaining counts, asserting that plaintiff cannot make a *prima facie* showing as to his race discrimination or retaliation claims under Title VII, disability discrimination or retaliation claims under the ADA, or hostile work environment claim.

## II.
### SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id.* A dispute is genuine only if a reasonable trier of fact could return a verdict for the nonmoving party. *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). "Under Rule 56, summary judgment must be entered against 'a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375-76 (5th Cir. 2002) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986) (quotations omitted). When ruling on a motion for summary judgment the court draws all reasonable inferences in favor of the nonmoving party. *Coury v. Moss*, 529 F.3d 579, 584 (5th Cir. 2008). A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 120 S. Ct. 2097, 2110 (2000). However, a plaintiff's mere beliefs, conclusory allegations, or unsubstantiated assertions are insufficient to survive summary judgment. *See, e.g.*, *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) (citation omitted).

### III.
### APPLICATION

#### A. TITLE VII CLAIM FOR RACE DISCRIMINATION

To establish a *prima facie* case of race discrimination, plaintiff must establish that he "(1) is a member of a protected class, (2) was qualified for the position that he held, (3) was subject to an adverse employment action, and (4) was treated less favorably than others similarly situated outside of his protected class." *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017).

Trevillion is African American (Doc. 1, p. 3, ¶ 8), making him a member of a protected class. *See* 42 U.S.C. 2000e-2. Union Pacific asserts, however, that this is the only element of the *prima facie* case that that Plaintiff can establish. Trevillion admits in his opposition memorandum "that he cannot satisfy all of the elements of a race discrimination claim" because he is "unable to name a white person who was treated similarly." Doc. 34, p. 10. Trevillion concludes that the summary judgment should be granted with respect to his racial discrimination claims. The court interprets this statement to reference the fourth element, which requires the plaintiff to be treated less favorably than a similarly situated employee outside his protected class. The court finds no reason in the record to reject Trevillion's conclusion, and the court therefore finds that summary judgment should be granted with respect to his racial discrimination claim under Title VII.

#### B. ADA CLAIM FOR DISCRIMINATION

Trevillion alleges violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. Count II alleges that defendant violated the ADA by failing to accommodate his alleged disability and discriminating against him because of said disability and/or the perception of a

disability. Doc. 1, pp. 11-12, ¶¶ 53-61. Defendant moves for summary judgment as to Count II and III, asserting that Plaintiff cannot make a *prima facie* showing of discrimination or retaliation under the ADA because he cannot prove that he was a "qualified" individual with a disability, but was instead restricted from working by his doctor due to safety concerns. Doc. 31, p. 1, ¶¶ 2-4. The court agrees that summary judgment is appropriate as to Trevillion's ADA claims.

Trevillion states two theories of recovery under the ADA: that Union Pacific failed to accommodate his alleged disability, and that Union Pacific made an adverse employment decision because of his alleged disability or perceived disability. Under either theory, Trevillion is required to show that he is a "qualified individual" for the purposes of the ADA, or a person "who, with or without reasonable accommodation, can perform the essential functions" of his job. 42 U.S.C. § 12111(8); *Cleveland v. Policy Mgmt. Sys. Corp.*, 119 S. Ct. 1597, 1603 (1999). Union Pacific argues that this is the element on which Trevillion's *prima facie* showing fails because his use of prescription medications Restoril and Lorazepam disqualified him from performing his job as a bridge tender. In his response to the motion for summary judgment, Trevillion admits that "Restoril is prohibited and he could not return to the job after the prescribing of Restoril." Doc. 34, p. 13 (citing *Cleveland*, 119 S. Ct. 1597). He therefore limits his ADA discrimination claim to the fourteen-day period immediately following the August 13, 2014, incident on the bridge. Doc. 34, p. 13. This period marks the time when he was off work during the medical evaluation, but before Dr. Quillin first prescribed Restoril on August 28, 2014. Doc. 34, att. 1, p. 106, 193-96.[1] He argues that being released to work by Dr. Renois on August 15, 2014, creates a genuine issue of material fact with regard to whether he suffered discrimination violative of the ADA during the fourteen-day period from August 14-28, 2014. His argument seems to be that, in that

---

[1] Dr. Quillin later wrote a letter regarding Trevillion's application for disability benefits, in which he references disability stemming from depression and anxiety, going back to his first visit with Trevillion on August 28, 2014.

fourteen-day period, he had been released to work by Dr. Renois, but not yet disqualified from performing his job by virtue of taking Restoril, and that he suffered discrimination by his employer because of a perceived disability before it became clear that his use of Restoril disqualified him from his position as bridge tender.

The question then becomes whether Trevillion makes a *prima facie* showing of an ADA violation during the two-week period before he admits to becoming disqualified as a bridge tender. Because there is no showing of a failure to accommodate during that period, and because putting an employee on paid medical leave is not an adverse employment decision, the court finds that Trevillion does not make a *prima facie* showing of discrimination during the two-week period from August 14 to August 28, 2014.

### 1. *Failure to accommodate*

To carry his burden on his failure-to-accommodate claim, Trevillion would have to show "(1) that he is a 'qualified individual with a disability;' (2) 'the disability and its consequential limitations were 'known' by the covered employer;' and (3) 'the employer failed to make 'reasonable accommodations' for such known limitations.'" *Feist v. La., Dep't of Justice, Off. of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (citations omitted); *Green v. United Parcel Serv., Inc.*, 20-30340, 2021 WL 935431, at *3 (5th Cir. Mar. 11, 2021). We find that Trevillion fails to make *a prima facie* showing with regard to the third element. Rather than failing to accommodate Trevillion, the record shows that during that 14-day period, representatives of Union Pacific were actively engaged in an attempt to assess Trevillion's fitness for duty and determine appropriate accommodations. *See* Doc. 34, att. 1, pp. 154-61, Doc. 31, att. 5, pp. 2-3, ¶¶ 5-15. According to Dr. Hughes' declaration, the medical department's goal during this period was to line up the necessary neurological and neuropsychological testing and, "get him back to work as soon as it

was safe to do so." Doc. 31, att. 5, p. 2, ¶ 7. Accordingly, summary judgment is appropriate with regard to the failure to accommodate claim under the ADA.

### 2. *Discrimination on the basis of disability and/or perceived disability*

Trevillion asserts that he was discriminated against because of a disability or perceived[2] disability during the August 14-28, 2014. To prevail on this theory, he must prove that 1) he has a disability, that 2) he is qualified for the job, and that 3) he suffered an adverse employment decision because of his disability. *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir.1996); *Rizzo v. Children's World Learning Ctrs., Inc.*, 84 F.3d 758, 763 (5th Cir. 1996); *see also Pinkerton v. Spellings*, 529 F.3d 513, 517–19 (5th Cir. 2008) (clarifying that the ADA does not require that disability be the sole cause of the adverse employment decision).

The court finds that Trevillion cannot make a *prima facie* showing with regard to the third element—an adverse employment decision. Union Pacific made no adverse employment decision in the 14-day period following August 13, 2014. In that period, the only employment decision Union Pacific made was to take Trevillion off active duty while his FFD evaluation was completed. Doc. 31, att. 5, pp. 2-3, ¶¶ 5-15. Trevillion testified that being "wrongfully put out of service" is the adverse employment action of which he complained. Doc. 34, att. 1, p. 27. Union Pacific made the decision to place Trevillion on medical leave because of his supervisor's concern that he had developed a medical problem that elevated his risk for on-the-job incapacitation. Doc. 31, att. 5, pp. 2, ¶¶ 5-7. This decision was undertaken in accordance with Union Pacific's FFD procedures and was found proper upon Dr. Hughes' review of Trevillion's medical records, which showed

---

[2] A plaintiff is "regarded as" being disabled if he "(1) has an impairment that is not substantially limiting but which the employer perceives as substantially limiting, (2) has an impairment that is substantially limiting only because of the attitudes of others, or (3) has no impairment but is perceived by the employer as having a substantially limiting impairment." *E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 729 (5th Cir. 2007).

him to be at elevated risk for a stroke. *Id.*, *see also* Doc. 34, att. 1, pp. 153-54. Placing an employee on paid medical leave does not constitute an adverse employment action for the purposes of ADA discrimination or retaliation analysis. *Austgen v. Allied Barton Sec. Servs., L.L.C.*, 815 Fed. Appx. 772, 777 (5th Cir. 2020) (holding that placing an employee on unpaid leave is not an adverse employment action); *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017); *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) ("Time off, whether paid or unpaid, can be a reasonable accommodation, but an employer is not required to provide a disabled employee with indefinite leave.").

Trevillion argues that, as a result of the August 13th incident, which he describes as workplace violence, he developed a condition that made it impossible to return to work, and that this constitutes constructive discharge. Doc. 34, p. 5. His argument resembles that made by the plaintiff in *McCoy v. City of Shreveport*, in which the Fifth Circuit explained the application of a "reasonable employee" inquiry to form an objective assessment of whether the particular facts and circumstances constitute constructive discharge:

> In determining whether an employer's actions constitute a constructive discharge, we examine the following relevant factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not. This inquiry is an objective, "reasonable employee," test under which we ask "whether a reasonable person in the plaintiff's shoes would have felt compelled to resign."

*McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) (citations omitted). As in that case, the court here concludes that, even considering the summary judgment evidence in the light most favorable to Trevillion, a reasonable employee in his position would not have been compelled to resign. Because his supervisor was concerned about his ability to do his job safely, Trevillion

was placed on medical leave pending an evaluation of his fitness for duty. Doc. 31, att. 5, pp. 2, ¶¶ 5-7. From that point, the Union Pacific HSD took over the evaluation, and Dr. Hughes determined that Trevillion was properly off work because of his elevated stroke risk, pending neurological and neuropsychological evaluation. Doc. 31, att. 5, pp. 2, ¶¶ 5-7. Ultimately, he never completed the FFD evaluation and retroactively received railroad disability pay. Doc. 34, att. 1, p. 223. From his personal, subjective standpoint, Trevillion found the events following the August 13th incident so upsetting that they precipitated his inability to return to work, but applying the objective standard articulated in *McCoy*, the court cannot say that these circumstances were such that a reasonable person would have felt compelled to resign.

### C. RETALIATION CLAIMS UNDER TITLE VII AND ADA

Trevillion alleges that he suffered retaliation under Title VII or the ADA. Title VII makes it unlawful for an employer to discriminate or retaliate against an employee because the employee has made a charge of discrimination against the employer. 42 U.S.C. § 2000e-3(a). "To establish a *prima facie* case of retaliation under the ADA or Title VII, a plaintiff must show that (1) [he] participated in an activity protected under the statute; (2) [his] employer took an adverse employment action against [him]; and (3) a causal connection exists between the protected activity and the adverse action." *Feist v. La. Dep't. of Justice, Office of Atty. Gen.*, 730 F.3d 450, 454 (5th Cir.2013)(citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007) (Title VII); *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (ADA). "If the employee establishes a *prima facie* case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation, which the employee accomplishes by showing that the adverse action would not have occurred "but for" the employer's

retaliatory motive." *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (citations omitted). In order to avoid summary judgment, the plaintiff must show "a conflict in substantial evidence" on the question of whether the employer would not have taken the action "but for" the protected activity. *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).

The Fifth Circuit has held that an adverse employment action includes "only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport,* 492 F.3d 551, 559 (5th Cir.2007) (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir.2002).

Trevillion meets the first prong of the test for retaliation, in that he filed an EEOC complaint against Union Pacific. His claim must nevertheless fail because he cannot establish that his employers took any adverse employment action against him or any causal connection between the two. As discussed in Part III.B.2, *supra*, the only employment decision Union Pacific undertook in the two-week period before Trevillion became undisputedly disqualified for his position was to place him on medical leave. After that point, Trevillion admits that Union Pacific had a legitimate and non-pretextual reason for finding him disqualified from the position, *i.e.*, his taking of prescription medications. Therefore, even if Trevillion could make a *prima facie* showing of retaliation, he cannot prove that Union Pacific's proffered legitimate, non-retaliatory reasons for placing him on medical leave and ultimately hiring a replacement for his job, are pretextual. *See McCoy v. City of Shreveport*, 492 F.3d 551, 561 (5th Cir. 2007).

### D. HOSTILE WORK ENVIRONMENT CLAIM

Finally, defendant moves for summary judgment as to the hostile work environment claim, asserting that Plaintiff cannot establish that he was harassed because of his race or alleged

disability and cannot show that the conduct to which he was subjected was sufficiently severe and pervasive.  Doc. 31, p. 3, ¶ 5.

To survive summary judgment on a hostile work environment claim, Trevillion must establish that (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment affected a term or condition of his employment; and (5) that Union Pacific knew or should have known about the harassment and failed to take prompt remedial action.  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347 (5th Cir. 2007).  Harassment affects a term or condition of employment if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).  Although "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive" to support evidence of a Title VII violation, "simple teasing, offhand comments, and isolated incidents, (unless extremely serious) will not amount to discriminatory charges" that can survive summary judgment.  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347–48 (5th Cir.2007) (internal citation omitted).  The inquiry into whether a work environment is hostile is necessarily fact-intensive:

> Whether an environment is hostile or abusive depends on the totality of the circumstances, including factors such as the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance.

*McCoy v. City of Shreveport*, 492 F.3d 551, 558 (5th Cir. 2007) (citation omitted).

Plaintiff's opposition brief describes a working environment in which a coworker conducted two "physical batteries" on the plaintiff (a reference to the incident of August 13, 2014) and in which that employee and another coworker have a history of using racial slurs.  The

opposition brief provides no record citations to support the allegations of racial slurs. A plaintiff's mere beliefs, conclusory allegations, or unsubstantiated assertions are insufficient to survive summary judgment. *See, e.g.*, *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) (citation omitted).

After having reviewed Trevillion's deposition, along with the affidavits submitted by Union Pacific in its reply memorandum, the court finds no basis to conclude that Trevillion was subjected to a pervasively hostile environment. Trevillion describes isolated incidents of conflicts or confrontations with coworkers, making and complaints about coworkers, but could not recall ever having accused them of racial discrimination. Doc. 34, att. 1, p. 65. Further, he describes Union Pacific responding to the unwelcome acts and, although he describes what he perceives as favoritism to white employees, he acknowledges that he had no desire to see coworkers lose their positions, and that he was at least partly satisfied by Union Pacific's responses to his complaints. Doc. 34, att. 1, pp. 45-73. Accordingly, Plaintiff's hostile work environment claim must also fail.

## IV.
### APPLICATION

For the reasons stated, the Motion for Summary Judgment filed by Union Pacific Railroad [Doc. 31] is **GRANTED** and plaintiff's claims against Union Pacific are dismissed with prejudice.

THUS DONE AND SIGNED in Chambers this 4th day of May, 2021.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE